# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0940-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

P.M.[1],

    Defendant-Appellant.

_____

Argued March 12, 2025 – Decided May 27, 2025

Before Judges Currier, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 20-01-0086.

Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Brian P. Keenan, of counsel and on the briefs).

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for respondent (Bradley

---

[1] We use initials and pseudonyms for the confidentiality of the child victims and their families. R. 1:38-3(c)(9) and (12).

D. Billhimer, Ocean County Prosecutor, attorney; William Kyle Meighan, of counsel and on the brief).

PER CURIAM

Following his conviction on sexual assault charges regarding several victims, defendant appeals, alleging the court committed numerous evidentiary errors during the trial, failed to provide requested jury instructions, and to sua sponte sever the charges. Defendant also alleges error in his sentence. After a review of the contentions in light of the facts and applicable principles of law, we affirm.

Defendant married E.M. (Esther) in 1993 when he was nineteen and she was in her thirties. At the time, Esther had three children, including M.L. (Mary) and J.H. (Jill). The couple then had three children together, including M.M. (Martha).

In 1996, Jill was seven years old and living with defendant, Esther, and her half-sisters Elizabeth and Martha. On February 5, 1996, Jill told a friend at school about inappropriate interactions between her and defendant. At the time, Jill was in a special education classroom at her school. The friend told their teacher, Kimberly Stevens, now Kimberly Connors. When Connors brought Jill into the hallway, Jill told the teacher that her "daddy [defendant] does strange things." Jill said that "he makes me go into my mother's and father's bedroom

and lay on the bed with no clothes on." Jill then told Connors that defendant "rubs himself against me." When Connors asked Jill what defendant rubbed, Jill pointed to her private area.

Jill then said that "no[t] only" did defendant rub himself against her, but he also "put[] it into her." Connors asked Jill where defendant "put it," and Jill pointed to her buttocks, saying "I don't like that when he does that, it hurts." Jill further told Connors that defendant "would make her watch movies of strange people doing strange things" and that defendant "called these things sex" and "he would do those things to her." Jill told Connors that these incidents happened "sometimes."

After their conversation, Connors went to the school counselor who called law enforcement. Shortly thereafter, detectives responded to the school along with a Division of Youth and Family Services (Division) case worker. Jill spoke with the investigators in the principal's office. Esther met Jill at police headquarters. The Division advised defendant he could not stay at the family's residence, so he moved to a nearby town.

On February 9, 1996, Jill gave a formal interview. The interview was audio- and video-recorded, transcribed and later played for the jury during defendant's trial.

3

At the beginning of the interview, the investigators asked Jill if she remembered speaking to them several days earlier at her school. They then asked her specifically if she remembered what she told her teacher:

[Q]: And -- and do you remember what you told Ms. [Connors]?

[Jill]: No.

[Q]: What did you tell Ms. [Connors]?

[Jill]: I -- I don't -- I don't --

[Q]: Do you remember telling [your friend]?

[Jill]: Yeah.

[Q]: And what did you tell [your friend] in school?

[Jill]: I tell -- I told her at -- at my house that -- that my dad does -- does stuff to me.

         . . . .

[Q]: And what did you tell -- what did you tell [your friend]?

[Jill]: That my dad --

[Q]: Are you tired?

[Jill]: I'm too tired.

[Q]: Oh, come on. Can you tell [us] what you told [your friend] about your dad?

[Jill]: I forgot to.

[Q]: What did you tell Ms. [Connors]?

[Jill]: I told her that -- that dad does S-E-X.

Investigators then asked Jill whether she knew the parts of her body, and whether she knew what her private parts were called. Jill identified her "butt" and "hinny." When asked what she did with her "hinny," Jill said that she went "to the bathroom with it."

The colloquy continued:

[Q]: . . . Remember when we talked, and you said someone touched your private parts?

[Jill]: Daddy.

[Q]: Daddy did.

[Jill]: My daddy. Not my real daddy, my stepdad.

[Q]: Okay, and that's [defendant]? And what did he do? When -- when did this happen?

[Jill]: When I was six and I went to kindergarten.

[Q]: I can't hear you.

[Jill]: When I was six, and I went to kindergarten.

[Q]: . . . And what happened?

[Jill]: And --

5

[Q]: I can't hear you.

[Jill]: S-E-X.

[Q]: He did S-E-X?  And where did he do it?

[Jill]: In his bedroom[.]

Jill then asked to go to the bathroom.  When she returned, the interview continued:

[Q]: Okay, what did he -- you have to tell us what he did to you.  You have to tell us what you told us before, okay.  What did he do to you?

[Jill]: He put his private on my butt.

[Q]: He put his private part on your butt?  What private part?  On your -- where?

[Jill]: --

[Q]: On your hinny?

[Jill]: No, on my butt.

[Q]: On your butt?  Then he put his private part on your hinny?  Have you ever seen his private part?  Yes.

[Jill]: He's all brown.

[Q]: He's all brown.  And . . . were you in his room?  You were in the bedroom?  And did you have your clothes on?

[Jill]: No we both had our clothes off.

6

A-0940-22

At this point in the interview, Jill then asked if her "dad [was] . . . [l]ying."

[Q]: What do you mean by that?

[Jill]: Did . . . he say that he didn't do it?

[Q]: I can't tell you what he said, but -- but why do you think that he was lying?

[Jill]: Because he didn't want to get in big trouble.

[Q]: Because he doesn't want to get in trouble. Why did he say something to you?

[Jill]: He just told me not to tell anybody.

[Q]: I'm sorry, I couldn't hear you [Jill].

[Jill]: He told me not to tell --

[Q]: He told you not to tell anybody? And . . . why did he say that? What did he do to you? Where were you?

[Jill]: I was --

[Q]: Were you laying down, were you sitting?

[Jill]: I was laying down.

[Q]: Laying down where? On what?

[Jill]: On the bed.

[Q]: On the bed. And who were you laying with?

[Jill]: When my . . . dad was gone then I laid with mommy.

7

A-0940-22

[Q]: When your dad was gone you laid with mommy? But when you were laying with -- with daddy, with [defendant], what happened? You said he touched your butt? He put his private on your butt? Yes?

[Jill]: I want to go see my mommy now.

At that point, the other investigator in the room asked Jill if he could ask her some questions, and she responded, "Yeah." He asked Jill some more specific questions about where and how she was lying on the bed when she was with defendant. Both investigators then continued:

[Q]: We know this might be hard for you to tell us again, but you have to tell us so that he doesn't do it again, okay.

[Jill]: I -- I don't know all the words, I forgot it.

[Q]: You don't know all the words. Okay. You said that [defendant], your father, touched you. Where did he touch you. Point to the places. He touched you in your butt? And where else? And what do you call that?

[Jill]: --

[Q]: And where -- where did he -- where did he touch you with? Did he touch you with his hands?

[Jill]: Hands.

[Q]: And what else did he touch you with? How else did he touch you? And what's that? Did he –

[Q]: Weiner?

8

[Q]:  Weiner?  Oh he -- his wiener.  Okay, and did his wiener touch your hinny?

[Jill]:  Yeah.

[Q]:  And his wiener -- did h[is] wiener touch your butt?  And did his wiener go inside of your butt?

[Jill]:  Yeah.

[Q]:  Did it hurt?

[Jill]:  Yeah.

[Q]:  Did his wiener go inside your hinny?  No?

[Jill]:  No.

[Q]:  It went inside of your butt?  . . . [H]ow were you laying down on the bed when he did that?  You can show us, it's okay.  Go ahead.

[Jill]:  -- tummy.

   . . . .

[Q]:  And you were laying on your tummy when you did it?  And where was he?  Was he laying on the side -- on the side of you?

[Jill]:  He was -- and I was over here.

[Q]:  And you were laying on your tummy, and where was he, was he on top of you, was he laying on the side of you?

[Jill]:  He was on top of me.

9

The investigators then asked Jill if she told anyone about what happened.

[Q]: And did you tell anybody what daddy did to you?

[Jill]: No.

[Q]: Why didn't you tell?

[Jill]: I didn't tell nobody.

[Q]: How come you didn't tell?

[Jill]: Because -- trouble.

[Q]: Huh?

[Jill]: I might -- get in trouble.

. . . .

[Q]: Did you see [defendant] do anything with his wiener?

[Jill]: No.

[Q]: Did you see him touch his wiener? No?

[Jill]: Yeah.

[Q]: Yeah, what did he do? Want to show me what he did?

[Jill]: Yeah.

[Q]: What did he do?

[Jill]: He touched it.

A-0940-22

[Q]: He touched it. How did he touch it? Like what? And that's it? And did you see anything come out of his wiener? What did you see?

[Jill]: Slime or something.

[Q]: Slime or something. And what did . . . it look like? What color was it?

[Jill]: White.

[Q]: It was white. And -- and where did it go? Do you know where it went?

[Jill]: On his tummy.

[Q]: On his tummy --

[Jill]: I want to go see my mommy now.

[Q]: A couple of minutes [Jill], all right hun, just a few more minutes -- Detective -- okay. Just a couple of more minutes.

The investigators continued to ask Jill for details. Jill said that defendant "smack[ed]" her and her sisters. The investigators asked Jill whether she had a VCR at home. Jill told them that her family had two VCRs and tapes like "Cinderella" and "Beauty and the Beast." The investigators then asked:

[Q]: You mentioned that [defendant] had [a] tape? What kind of tape was it? Do you remember what the name of it was?

[Jill]: Yeah.

11

A-0940-22

[Q]:  What?

[Jill]:  Sex.

[Q]:  Sex.  And … did you see the tape?

[Jill]:  Yeah.

      . . . .

[Q]:  Oh, and -- and who put the tape in the VCR?

[Jill]:  Dad -- my dad.

During additional questioning, Jill clarified that the incidents happened when she was six and seven years old.

On March 5, 1996, Jill was examined by Dr. Martin Finkel, who provided expert testimony during defendant's trial.  At the time of trial, Dr. Finkel was a pediatrician who worked for Rowan University School of Osteopathic Medicine.  Dr. Finkel was the "founder and director of the CARES Institute, Child Abuse Research Education Service Institute."  Dr. Finkel testified that CARES "[is] a specialized resource of a Diagnostic and Treatment Center, when there's suspicion or concern for child abuse and neglect.  It's a resource for assessing children who ha[ve] been suspected of experiencing any form of child maltreatment.  We provide diagnostic and treatment services."

A-0940-22

Dr. Finkel explained when he examined a child like Jill, he first speaks to the parent, and then to the child. He also takes detailed notes of the child's medical history.

Dr. Finkel testified that when he spoke to Jill independently, she expressed something happened to her that was "confusing or difficult to understand by somebody that [she] kn[ew] and [she] trust[ed]." When Dr. Finkel asked her if she thought she was at fault, she said yes because she did not tell anyone at the time it happened to her. She told him she did not tell because she did not want to get in "big trouble." Jill said, "[i]f I don't tell what my dad did, then they will never know." Jill then said that her mother thought she was lying. Jill told Dr. Finkel that her stepfather did this to her, and when the doctor asked for his name, she said defendant.

Dr. Finkel stated that Jill used the word "hinny" for her vaginal area, and "wiener" for a male penis. Jill said that defendant touched her hinny with the front part of his private part, and that neither of them had clothes on while this happened.

Finkel testified that he used a plastic model of the female anatomy to talk to Jill and specifically, to ask her whether defendant had touched her buttocks. Jill told the doctor that defendant put his wiener on her buttocks, like he was

13

wiping, and moved it back and forth. She then pointed to her vagina and said that defendant also touched her there with his wiener. Using the anatomic model, Jill indicated that defendant put his penis in what Dr. Finkel described as her "vaginal vestibule." Jill said it hurt when defendant did that to her, and that it hurt afterwards, when she went to the bathroom.

Jill told Dr. Finkel that she had to clean herself after the interactions with defendant from the "yucky stuff" that came from his "front private" and got on her buttocks and genital area. Dr. Finkel asked if defendant had kissed Jill, and she said "yeah, his tongue here," pointing to her vagina. Dr. Finkel then asked if defendant put anything in her mouth, and she said, "his wiener." She said that "yucky stuff" that "tasted like slime" got into her mouth, and she spit it out into the sink.

Dr. Finkel also conducted a physical examination of Jill. The results of the physical examination were "totally normal," and Dr. Finkel explained

> that any penetration that [Jill] experienced was limited to penetration between the labia, because it caused, it also, I know it was inside in that sense. Because she complained that it hurt her to pee afterwards. So she had trauma to the tissues surrounding the urethra, the media aspect -- inner aspects of the labia minora. But those injuries that she incurred were superficial and healed as we would expect.

A-0940-22

. . . So most of the injuries that get[] incurred as a result of sexual abuse, particularly in the pre-pubertal age group, are going to be superficial. And because of delayed disclosure they typically are all healed, even though [the victims] give a very clear description of having injuries.

Dr. Finkel concluded that

[Jill] gives a fair, clear history [of] oral genital contact. She gives a clear history of experiencing genital to genital contact, and genital to anal contact. The genital to genital contact was perceived as being inside. The genital to anal contact was perceived as between the buttocks rubbing causing her discomfort there, as well.

I have no alternative explanation for her to be able to describe the experiences that she had in the manner that she had to explain it, other than having experienced such.

Following the investigation, Esther left the family home and went to live with defendant. Jill lived with a family friend and then was placed into foster care.

In the summer of 1996, Jill testified before a grand jury that defendant did not touch her. As a result, defendant was not charged.

After the grand jury proceedings, Jill lived with her biological father, but then returned to foster care and eventually, shelters. She ran away and wound up homeless. At eighteen, she returned to live with Esther and defendant, feeling she had no other option.

A-0940-22

In 2019, Jill's younger half-sister, Martha, told local police she was sexually abused by defendant, and he had also assaulted Jill, and her niece, H.M. (Hillary).

A grand jury indicted defendant for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts one, three, five, and seven), second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts two, four, six, and eight), first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a) (count nine), and third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count ten). Counts one and two were for offenses committed against Jill; counts three through six were for offenses against Hillary; and counts seven through ten were for offenses against Martha. Counts three and ten were subsequently dismissed.

Martha testified at defendant's trial, explaining the family dynamic. She said defendant was her biological father, Esther was her biological mother, she had three half-sisters including Jill and Mary, and two sisters. Mary had a daughter, Hillary, who was Martha's niece and only two years older than her. Martha noted that although Mary and Hillary lived separately from her family when they were younger, Hillary visited Martha and her family "[a]t least every weekend."

Martha testified that she was assaulted between the ages of six or seven and fourteen. She said that defendant would either bring her to his bedroom or sometimes she would go in herself to say good morning and lay in bed with him. She said he would act like he was sleeping, and then he would slip his hands under her pants and touch her. Martha testified that "[h]e used to finger [her] vagina. He used to make [her] lay on the bed and put [her] feet against the wall and continuously have sex with [her]." Martha said defendant used a condom during the assaults.

Martha stated that these incidents happened "way more" than she "c[ould] count." Esther would either be cooking breakfast, or, if it happened at night, Esther would be at work. During the interactions, defendant told Martha, "you're helping me; you know that? I love you. But, you're helping me. This helps me. I wouldn't do anything to hurt you. You know I love you; right?" After the assaults, Martha said defendant tried to give her money and take her shopping. He also bought her a phone.

When Martha discovered her sisters were going into defendant's bedroom, she told defendant that was "enough" and that she wouldn't let him "hurt [her] little sisters like [he's] hurt [her]." She threatened to tell if she discovered he did anything to them.

A-0940-22

Martha said that through the years, she told her childhood friend about the incidents, as well as Hillary and later, Mary. She never reported defendant to any authority.

After Martha had a daughter in 2018, she refused to let defendant have any contact with the baby. Some months later, defendant told Martha that she needed to "get over what happened" to her and he could take her daughter away at any time and see her whenever he wanted. Around that same time, Martha found out that defendant was having an affair. Defendant wanted to divorce Esther, but he wanted Esther to pay for the costs. It was then that Martha made the decision to go to the police.

Shortly thereafter, Hillary contacted law enforcement indicating she wanted to provide a statement and proceed with charges against defendant. Hillary also advised that Jill wanted to provide a statement as well. After the interviews concluded, defendant was arrested and brought back to New Jersey, where he was ultimately charged. Additional interviews were conducted with family members, including Esther. Esther died prior to the trial.

During Jill's trial testimony, she stated that her first recollection of abuse by defendant was when she was between six and seven years old. She said defendant brought her into his and Esther's bedroom, put on a pornographic

18

video, lit candles, and played music. He then laid Jill down on the bed and touched her vagina. Esther was not home at the time. Jill recounted that defendant threatened to send her to school in diapers and to tell other people that she wore diapers if she told anyone what was happening to her.

Jill said that defendant touched the "top part of [her] vagina," which "freaked [her] out." Defendant then ran to the dresser that was in the room, got cream, and put the cream on her "butt." Jill testified that she could not remember what happened after that.

On another occasion, Jill said that she and defendant were in the living room, and he was sitting on a couch. Defendant then "pulled out his penis" and had Jill "put [her] mouth on it." He then "lifted [Jill] up and put his tongue on [her] vagina." Jill said Esther was not home at the time. Jill testified defendant again told her that she "would get in trouble" if she told anyone and that Esther "didn't love [her]." He also repeated that he would send her to school in a diaper and tell other people that she peed the bed. After he was done, he gave Jill a bath.

Jill testified that these incidents with defendant happened at least three times and probably more, but she could not remember a specific number of times something happened. Jill said she did not immediately tell anyone about the

19

assaults because she was afraid she "would get in trouble and that [defendant] would [s]end [her] to school with diapers on."

Jill recalled appearing before a grand jury in 1996 and telling the grand jury that defendant did not touch her. She explained to the petit jury that she remembered "being scared" and that she "wanted to just be with [her] mom again." She said, "I knew if I lied that I could be with her again . . . ."

Hillary also testified at defendant's trial, stating when she was younger, she would stay at Esther's house "just about every weekend." Defendant was her step-grandfather.

Hillary testified that when she was about five years old, she was in the living room with defendant, who was sitting in a recliner. It was late at night and everyone else was asleep. Hillary said that she sat on defendant's lap, and defendant put a blanket over her, pulled down her pants, licked his fingers, and rubbed her vagina. She did not tell anyone what happened because she knew what had happened to her aunt Jill, who was called a liar and taken away from the family.

Hillary described other incidents with defendant. She recounted when she stayed overnight, she would go into defendant's bedroom and lay on his side of the bed because she "would just be scared and want[ed] to sleep with

20

somebody." After she got in bed, defendant "would roll over and pull [her] pants down" and "put his fingers in [her] vagina." Other times, defendant "would put his penis in between [her] legs and hump [her]." Hillary said that Esther would sometimes be "sleeping on the other side" of the bed, and sometimes "[Esther] would wake up and leave the room and close the door behind her." Hillary did not tell anyone about these incidents because she was scared that no one would believe her. As she got older, she was scared she would "tear apart" the family.

Hillary recalled another occasion, when Esther was not home, when defendant attempted to perform oral sex on her, but Hillary "yelled at him," telling him she "didn't like it" and "to stop." She said defendant did stop and left the bedroom.

Hillary said that something happened between her and defendant "[a]lmost every time that [she] was [at his home]." The last time it happened was when she was about ten or eleven years old. She testified she had argued with the other girls about what to watch on television, so defendant let her watch television alone in his bedroom. He joined her, closing the door behind him and then laying on the bed. He unzipped his pants and began "rubbing his penis on the outside of his underwear." He asked Hillary, "well now what are you going to do for me since I let you watch the show[?]" She said "nothing, I don't want

21

to do anything," and "kept saying no."  Defendant then "stormed out of the room and slammed the door behind him."  Hillary testified that the abuse stopped after that incident.  However, around the same time, she sometimes saw Martha in defendant's bed as Hillary came into the room.

When Hillary was around fourteen years old, she disclosed what had happened between her and defendant to her boyfriend, J.D. (Joe).  She told him that she was uncomfortable being intimate with him because of what defendant did to her.  She told Joe that she did not want to tell anyone, and he agreed.

When Hillary was around fifteen years old, she was with Martha at Mary's house, when Martha started crying.  Martha told Hillary what defendant had done to her, and Hillary responded that she understood how Martha was feeling because defendant had done the same things to her.  They both agreed not to tell anyone what had happened.  Hillary testified that she did not tell Mary because she did not think her mother would believe her.

Hillary stated she learned in August 2019 that defendant wanted a divorce. He had left Esther and moved to another state.  Hillary sent defendant a text message and told him to "leave [Esther] alone."  The entire text message said:

> [L]eave her f[***]ing car alone.  You're being so goddamn f[***]ing petty.  It's not even f[***]ing funny anymore.  You're acting like a goddamn child.  You want a goddamn divorce, then f[***]ing pay for it.

A-0940-22

Send her the f[***]ing papers. She's not signing false documents to you that you sold that house for $1.00. Bull[****], she's not getting in trouble for you because you lied on paperwork. You want sh[**] signed, then send over the paperwork with the correct amount you sold the f[***]ing house for. You want to involve your children and try to ruin her f[***]ing life, well guess what? Now, I'm involved and we both know I'll ruin your life way worse than you could ever even attempt to do to her. Enough is enough, quit f[***]ing with her.

Hillary testified she sent the text because she was angry with defendant for upsetting Esther. In response, defendant said, "I love you, too." Hillary replied, "[Y]ou're disgusting."

In September, Martha sent Hillary a Facebook message saying that she needed to talk to her and that it was an emergency. Before Hillary could respond, Martha called her. Hillary testified that Martha was hysterical and said she was going to the police station to file a report against defendant. Hillary told Martha she could say Hillary was also abused and if Martha needed her to come forward against defendant, she would.

Joe also testified at defendant's trial. He stated that when he was dating Hillary in high school, she told him defendant had inappropriately touched her. He did not tell anyone else what Hillary had said.

Martha's close childhood friend testified that one day when the girls were about thirteen years old, Martha was very upset and told her that she had been

23

"touched inappropriately" by defendant. The friend told her mother afterwards, but no one else.

Mary testified that Martha did tell her about a time when she was abused by defendant. She said that Martha told her that "one night" defendant "had been drinking and was drunk," and he "dragged [Martha] down the hallway" of their house and "raped her." At the time this conversation happened, Martha was around seventeen years old. Mary did not tell anyone about the incident because Martha "begged" her not to. As for her own daughter, Hillary, Mary said she had no idea that defendant was abusing her. Mary only learned about the abuse after Hillary spoke with the prosecutor's office.

Defendant also called several witnesses. The first was defendant's stepdaughter, Elizabeth, who testified that because defendant was "Mexican," when she and her sisters were younger, they "didn't like him in [their] family." She was "sure" both she and Jill had made comments to that effect.

Elizabeth also testified that on one occasion, she remembered seeing Jill outside of the house one morning, wearing a pull-up diaper. Elizabeth said that Jill was around six years old at that time, and it upset Elizabeth to see that.

Retired detective Kimberly Trujillo-Tovar also testified. She recalled speaking with Elizabeth in 1996 when Elizabeth mentioned that she had a

24

boyfriend and suggested to the detective that maybe Jill saw something occur between Elizabeth and her boyfriend. Trujillo-Tovar further testified that when she spoke with Jill, Jill said defendant was "no good" for her mother because he was "Mexican."

Defendant testified on his own behalf. He denied inappropriately touching Jill, Martha, and Hillary. He testified that after filing for divorce in August 2019, he received threats from Hillary and Martha. At that time, he stopped paying bills for Esther, which included a phone bill on which the girls were covered.

Defendant confirmed that he moved to another state in 2017, and that Martha helped him with the move, and stayed with him in the new residence for about one month. Defendant stated that his relationship with Esther deteriorated after he moved. Defendant said he put a pull-up diaper on Jill because she had a "bed-wetting problem."

The jury convicted defendant on all counts. The court sentenced defendant to an aggregate term of forty-five years of imprisonment, with twenty-five years of parole ineligibility. The court also imposed parole supervision for life, penalties pursuant to Megan's Law, N.J.S.A. 2C:7-1 to -23, and other requisite fines and penalties.

A-0940-22

On appeal, defendant raises the following points for our consideration:

POINT I
THE PRETRIAL DECISION PRECLUDING QUESTIONING ABOUT J[ILL]'S PRIOR FALSE ALLEGATION OF SEXUAL ASSAULT BY AN UNKNOWN INDIVIDUAL NAMED PAUL VIOLATED DEFENDANT'S RIGHTS TO CONFRONTATION, DUE PROCESS, AND TO PRESENT A DEFENSE.

POINT II
THE PRETRIAL DECISION PRECLUDING QUESTIONING ABOUT J[ILL]'S PRIOR ALLEGATION OF SEXUAL ASSAULT BY AN UNKNOWN HISPANIC MAN, IN ORDER TO ESTABLISH SEXUAL KNOWLEDGE AND THIRD-PARTY GUILT DEPRIVED DEFENDANT OF HIS RIGHTS TO CONFRONTATION, DUE PROCESS AND TO PRESENT A DEFENSE.

POINT III
THE TRIAL COURT ERRED IN ADMITTING J[ILL]'S UNRELIABLE 1996 STATEMENT TO THE POLICE AND THE REPETITIVE STATEMENT TO DR. FINKEL UNDER THE TENDER YEARS EXCEPTION TO THE HEARSAY RULE.

A. The Unreliable Statement to the Police Was Inadmissible Under N.J.R.E. 803(c)(27) - The Tender Years Exception.

B. J[ill]'s Unreliable Statement to Dr. Finkel Was Cumulative and Unduly Prejudicial and Was Therefore Inadmissible Pursuant to the Tender Years Exception to the Hearsay Rule, N.J.R.E. 803(c)(27).

POINT IV
THE TRIAL COURT ERRED IN ADMITTING HEARSAY STATEMENTS BY J[ILL], M[ARTHA], AND H[ILLARY] AS FRESH COMPLAINTS BEFORE A JURY THAT HAD NO DOUBTS ABOUT DELAYED REPORTING BY ADOLESCENTS.

POINT V
THE TRIAL COURT ERRONEOUSLY LIMITED THE DEFENSE'S CROSS-EXAMINATION OF THE STATE'S WITNESSES.

POINT VI
THE TRIAL COURT IMPROPERLY ALLOWED DR. FINKEL TO BOLSTER J[ILL]'S CREDIBILITY AND TO PROVIDE A NET OPINION THAT, DESPITE THE ABSENCE OF PHYSICAL EVIDENCE, HE KNEW THAT THERE HAD BEEN PENETRATION.

POINT VII
THE TRIAL COURT IMPROPERLY ALLOWED THE ALLEGED VICTIMS TO TESTIFY ABOUT HOW THE ABUSE AFFECTED THEM.

POINT VIII
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR A FALSE IN ONE CHARGE.

POINT IX
AFTER A PREJUDICIAL JOINDER OF OFFENSES WITH THREE ALLEGED VICTIMS OVER THE COURSE OF MORE THAN A DECADE, THE TRIAL JUDGE FAILED TO SUA SPONTE SEVER THE CHARGES OR INSTRUCT THE JURY TO REFRAIN FROM USING THE EVIDENCE FROM THE SEPARATE OFFENSES FOR PROPENSITY PURPOSES.

A-0940-22

A. Severance Was Required Because The Separate Charges Were Not Mutually Relevant To A Material Issue in Dispute, And Any Possible Probative Value Of The Separate Charges Was Outweighed By The Undue Prejudice Of A Joint Trial.

B. The Trial Court Committed Plain Error By Failing To Provide A Limiting Instruction That The Separate Charges Could Not Be Used To Infer Propensity.

POINT X
THE TRIAL COURT'S ACCUMULATED ERRORS DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT XI
THE SENTENCING COURT COMMITTED SEVERAL ERRORS RESULTING IN A MANIFESTLY EXCESSIVE SENTENCE, FAILED TO PROPERLY MERGE COUNTS, AND IMPROPERLY ORDERED NO CONTACT WITH FAMILY MEMBERS.

We begin with a consideration of Point IX and then will address the alleged evidentiary errors.

Severance

Defendant contends the trial court erred by failing to sua sponte sever the charges in this case. Defendant asserts "[i]t was clear from the start of this case that the offenses concerning J[ill] originally initiated in 1996, were separate and distinct from the delayed reporting charges concerning H[illary] and M[artha] raised for the first time in 2019," and for that reason, the charges should have

been severed.  Alternatively, he states that the court failed to instruct the jury to "refrain from using the evidence from the separate offenses for propensity purposes."

Rule 3:7-6 permits the State to charge multiple offenses in a single indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together."  "Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial."  State v. Sterling, 215 N.J. 65, 72-73 (2013).

Rule 3:15-2(b) provides for relief from prejudicial joinder, and states:  "If for any . . . reason it appears that a defendant . . . is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment . . . the court may order . . . separate trials of counts . . . or direct other appropriate relief."  "A court must assess whether prejudice is present, and its judgment is reviewed for an abuse of discretion."  Sterling, 215 N.J. at 73 (citing State v. Chenique-Puey, 145 N.J. 334, 341 (1996)).

"The test is whether the evidence from one offense would have been admissible N.J.R.E. 404(b) evidence in the trial of the other offense . . . ."  Id. at 98.  "If the evidence would be admissible at both trials, then the trial court

may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Chenique-Puey, 145 N.J. at 341 (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)). To avoid prejudicial joinder, the court must conclude the proffered evidence for each set of charges would be admissible in a separate trial on the other set of charges, because the "[Rule] 404(b) requirements . . . [are] met, and the evidence of other crimes or bad acts [is] 'relevant to prove a fact genuinely in dispute and the evidence is necessary as proof of the disputed issue.'" Sterling, 215 N.J. at 73 (first citing State v. Cofield, 127 N.J. 328, 338 (1992); and then quoting State v. Darby, 174 N.J. 509, 518 (2002)).

Our Supreme Court explained in State v. Green:

> [N.J.R.E.] 404(b) bars "evidence of other crimes, wrongs, or acts" when used "to show that [a] person acted in conformity therewith." However, evidence of prior "crimes, wrongs, or acts" may be used to show "intent, . . . knowledge, . . . or absence of mistake or accident." Because evidence of a defendant's other crimes "has a unique tendency" to prejudice the jury, other-crimes evidence proffered under [N.J.R.E.] 404(b) "must pass [a] rigorous test."
>
> [236 N.J. 71, 81 (2018) (alterations and omissions in original) (first quoting Rule 404(b); then quoting State v. Reddish, 181 N.J. 553, 608 (2004); and then quoting State v. Garrison, 228 N.J. 182, 194 (2017)).]

That "rigorous test" is the four-part Cofield test:

30

(1) The evidence of the other crime must be admissible as relevant to a material issue;

(2) It must be similar in kind and reasonably close in time to the offense charged;

(3) The evidence of the other crime must be clear and convincing; and

(4) The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

Generally, a defendant is required to make a motion to sever the charges before trial. R. 3:15-2(c); R. 3:10-2. "[A]fter a trial of several charges without objection, it takes a strong showing of probable prejudice in fact to warrant a finding of 'plain error.'" State v. Baker, 49 N.J. 103, 105 (1967).

Here, defendant did not move to sever the charges. Moreover, prior to jury selection, counsel agreed to the following open-ended question to screen for potential prejudice among jurors: "[W]ill the number of victims in this case, three victims, and that all the victims are related to one another prevent you from keeping an open mind and fairly evaluating all of the evidence presented? If so, please explain."

A review of the record clearly demonstrates defendant wanted to try the charges together to advance his theory of the case, which was that Jill, Hillary,

and Martha concocted these allegations to punish defendant for divorcing Esther. Notably, during closing arguments, defense counsel made the following remarks: "They're not getting their stories straight. That's why this matters. All three of them can't get their stor[ies] straight." "[T]hey're already hatching a plan because they're upset . . . . This right here is all motive to make this up." "I submit to you that [Hillary] and [Martha] are already starting to hatch these allegations. They're already starting to hatch this plan." "This is, again, the motive; the motive to make up these allegations. Make up these allegations just like [Jill] . . . . They knew what [Jill] said back in the day. And make up allegations just like [Jill] did." "They're all giving different versions here because these are all made-up stories, because they all didn't get their stories straight before they went to the police. Again, because if you're allegedly a child rapist, I think you're going to do the same thing even if it's a different child." "These are just disgusting allegations that they made up because [defendant] was divorcing their mother and their grandmother and trying to get rid of the house, trying to get—you know, cutting off the phone bills, the car insurance, [Martha] being unemployed."

Because defendant pursued this trial strategy and did not request a severance of the charges, the trial court did not conduct an analysis using

32

Cofield's four-part test to determine whether evidence regarding the sets of charges would be admissible under Rule 404(b) if tried separately.

Nevertheless, we are satisfied that had defendant moved for severance, the motion would have been denied, because "the proffered evidence for each set of charges would be admissible in a separate trial on the other set of charges." State v. Smith, 471 N.J. Super. 548, 567 (App. Div. 2022).

A material issue in this case was the victims' credibility. Hillary and Martha both testified that one of the primary reasons they did not come forward with their allegations against defendant when they were younger was because they saw what happened when Jill reported her abuse. Thus, if the charges against Hillary and Martha were tried separately, evidence of Jill's prior disclosure of sexual abuse by defendant would have been admissible at that trial.

Similarly, Jill testified that she came forward in 2019 because Hillary and Martha contacted her regarding their intention to report the abuse by defendant. Thus, if the charges against Jill were tried separately, evidence of what occurred between defendant and Hillary and Martha would have been admissible at that trial. Accordingly, prongs one, two, and three of Cofield are met.

As for Cofield's fourth prong, a court must determine that "the probative value of such evidence is outweighed by [the] potential for undue prejudice" in

order to exclude it.  <u>Green</u>, 236 N.J. at 83 (citing <u>State v. Barden</u>, 195 N.J. 375, 389 (2008)).  We are satisfied it was.

As the record shows, the evidence was intertwined.  The allegations against defendant involved the sexual assault of his stepdaughter, step-granddaughter, and biological daughter who were all under his care and control.  The acts occurred close in time, were similar in nature, and committed in the same or similar locations.  Hillary and Martha failed to disclose the abuse when they were younger because of what happened to Jill.  Jill only came forward as an adult after being contacted by Hillary and Martha.  Thus, they all would have been called as witnesses by the State to testify in separate trials.

In addition, defendant's trial strategy was that Jill, Hillary, and Martha were lying, and he relied on discrepancies in their statements to support his theory.  If defendant believed he was prejudiced by joinder of the charges, he would have moved for severance pretrial.

Defendant asserts that even if joinder was proper, the court should have issued the jury adequate limiting instructions.  Defendant did not request a specific non-propensity instruction during the charge conference.

"When other-crimes evidence is admitted pursuant to Rule 404(b), the jury must be instructed as to the permissible use of such evidence and its limited

34

relevance." State v. Winder, 200 N.J. 231, 255 (2009) (citing State v. Stevens, 115 N.J. 289, 304 (1989)). The trial court's instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." Ibid.

"In determining whether a charge was erroneous, the charge must be read as a whole." State v. Jordan, 147 N.J. 409, 422 (1997) (citing State v. Wilbely, 63 N.J. 420, 422 (1973)). "No party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." Ibid. (citing Largey v. Rothman, 110 N.J. 204, 206 (1988); State v. Thompson, 59 N.J. 396, 411 (1971)).

Because defendant did not object to the jury charge, the instructions are reviewed for plain error and thus, reversal is only warranted if the error was one "clearly capable of producing an unjust result." State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

Here, the court gave the following instruction:

> There are [eight] offenses charged in the indictment. They are separate offenses by separate counts in the indictment. In your determination of whether the State has proven the defendant guilty of the crimes charged

> in the indictment beyond a reasonable doubt, the defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge based on the law as I will give it to you. The statute, read together with the indictment, identifies the elements which the State must prove beyond a reasonable doubt to establish the guilt of the defendant . . . on each of the counts in the indictment.

The failure to advise the jury that it could not consider the other crimes evidence as proof of defendant's propensity to commit the charged crimes was not error "clearly capable of producing an unjust result" because the court specifically instructed the jury that the charges were to be considered separately. See R. 2:10-2.

We turn to defendant's assertions of evidentiary error.

<u>Tender Years Exception</u>

Prior to trial, the State sought to admit into evidence Jill's 1996 recorded interview with investigators and her statements to Dr. Finkel during her medical examination under the tender years exception to the hearsay rule, N.J.R.E. 803(c)(27). Alternatively, the State sought to admit Jill's statements to Dr. Finkel pursuant to N.J.R.E. 803(c)(4), statements made for the purpose of medical treatment. The court granted the motion following a hearing.

In its written opinion, the court considered Jill's 1996 interview and stated:

Overall, the recording depicts the interviewers asking J[ill] open-ended questions. J[ill] consistently described defendant touching her genitals in her initial disclosure at school and during the interview. J[ill]'s language, although partially expected of a child of her age, included a detailed description of defendant's genitals and ejaculate. And there is no prior argument or indication that J[ill]'s disclosure was motivated by some national or ethnic bias against defendant. . . . Therefore, the court finds that the statement J[ill] made to [investigators] is trustworthy based on time, content, and circumstance.

As for Jill's statements to Dr. Finkel, the court found:

[Jill]'s statements to Dr. Finkel are trustworthy. As noted above, there is no indication outside of defense counsel's assertions that J[ill] had a motive to fabricate her statement, i.e., her alleged dislike of defendant's Mexican nationality. Further, the court finds J[ill]'s statements were not inconsistent. In . . . both her statements—the first to [investigators], and the second to Dr. Finkel—J[ill] described a similar course of inappropriate conduct. J[ill] disclosed that defendant touched her vagina and anus. J[ill] also disclosed that defendant revealed and touched her with his penis in both statements. Finally, in both statements J[ill] provided a detailed description of defendant's ejaculate. Along with her similar descriptions of defendant's conduct in both statements, J[ill] told both investigators and Dr. Finkel that she initially disclosed the abuse to her friend, . . . who then told their teacher. And despite defense counsel's assertion that J[ill]'s recantation renders her statement untrustworthy, the focus of the tender years exception is the trustworthiness of the statement itself at the time it was made—not the statement's trustworthiness in light of some later event.

A-0940-22

Thus, the court permitted both statements to be admitted during defendant's trial pursuant to the tender years exception to the hearsay rule.

On appeal, defendant contends the court "failed to apply the trustworthiness factors" that have been enumerated by our Supreme Court in State v. Michaels, 136 N.J. 299, 312-13 (1994), in considering the admission of Jill's statement to investigators. Defendant cites to a number of "suggestive questions" from the interviewers, which he claims the court failed to properly consider, as well as the fact that the video recording was not Jill's first interview, but rather her third with the same interviewers.

N.J.R.E. 803(c)(27) provides:

> A statement made by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

When determining whether a statement is sufficiently trustworthy to warrant its admission under the tender years exception, a court must consider "the totality of the circumstances." State v. P.S., 202 N.J. 232, 249 (2010). Our Supreme Court has identified the following "non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims of sexual abuse": (1) the spontaneity of the statement, whether it was made without prompting or suggestive questioning; (2) whether the account provided by the declarant is consistently repeated; (3) the "mental state of the declarant"; (4) the "use of terminology unexpected of a child of similar age"; and (5) the declarant's "lack of motive to fabricate." Ibid. (citing Idaho v. Wright, 497 U.S. 805, 821-22 (1990)); see also State in the Int. of A.R., 234 N.J. 82, 103-04 (2018).

The Court has further recognized that the spontaneity of a child's statement can be impacted by "prior interrogation, prompting, or manipulation by adults." State v. D.G., 157 N.J. 112, 133 (1999) (quoting Wright, 497 U.S. at 826-27) (concerning the involvement of actors outside law enforcement, such as family members). Other factors include the partisanship of the questioner and the questioner's ability to observe and recall the statement. State v. R.M., 245 N.J. Super. 504, 516-17 (App. Div. 1991). A trial court's analysis may

additionally be informed by factors such as: (1) "a lack of investigatory independence"; (2) "the pursuit by the interviewer of a preconceived notion of what has happened to the child"; (3) "the use of leading questions"; (4) "a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers"; (5) "[t]he use of incessantly repeated questions"; (6) "[t]he explicit vilification or criticism of the person charged with wrongdoing"; and (7) "the interviewer's tone of voice, mild threats, praise, cajoling, bribes and rewards, as well as resort to peer pressure." Michaels, 136 N.J. at 309-10.

"[C]ourts have considerable leeway in their consideration of appropriate factors" so long as the factors relate to "whether the child declarant was particularly likely to be telling the truth when the statement was made." D.G., 157 N.J. at 125 (quoting Wright, 497 U.S. at 822). Specifically, a court's

> determination of reliability or trustworthiness sufficient to allow admission of evidence [under N.J.R.E. 803(c)(27)] should not be disturbed unless, after considering the record and giving the deference owed to the court's credibility findings, it is apparent that the finding is "clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction[.]"
>
> [P.S., 202 N.J. at 250-51 (alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).]

After a careful review, we are satisfied Jill's statement was sufficiently trustworthy to warrant its admission at trial. The recording reveals that the first mention of any sexual contact came directly from Jill, and although investigators asked her follow-up questions regarding the details of that sexual contact, Jill's answers were of her own volition. The investigators did not put words in her mouth or lead her to remember things falsely.

Regardless, some leading questions during a child's interview are not necessarily inappropriate; in fact, those types of questions may be necessary to move a conversation along. See State v. Delgado, 327 N.J. Super. 137, 147-48 (App. Div. 2000) ("Due to a child's natural hesitancy around strangers and authority figures, leading questions by an investigating officer are not necessarily inappropriate; the presence of leading questions in an interview may be necessary and does not automatically make the child's statement untrustworthy."). Nevertheless, the recording shows the investigators did not pressure Jill to answer in any way. She described, in her own words, what defendant did to her.

Although Jill did ask for Esther several times, the investigators were kind to her and assured her they would get Esther after some additional questions.

The entire interview lasted approximately one hour. There is no suggestion that Jill was asked to answer more questions in order to be released.

We discern no misuse of discretion for the court to admit Jill's interview with investigators into evidence at defendant's trial.

As for Jill's statement to Dr. Finkel, defendant argues, for the first time, that the "unreliable statement . . . was cumulative and unduly prejudicial and was therefore inadmissible pursuant to the tender years exception to the hearsay rule."

Relevant evidence may be excluded by the trial court if "its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice . . . waste of time, or needless presentation of cumulative evidence." R. 403(a), (b). Our Supreme Court has noted that, when considering the admissibility of repetitive corroborative statements under the tender years exception to the hearsay rule, the trial court "should be cognizant of its right under N.J.R.E. 403, to exclude evidence, if it finds in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value." D.G., 157 N.J. at 128; see also State v. Smith, 158 N.J. 376, 391 (1999) (finding that "trial courts in a proper case must serve as gatekeepers when repetitive corroborating hearsay evidence is proffered pursuant to" Rule 803(c)(27)).

Dr. Finkel's testimony regarding what Jill told him during her examination had probative value and was not needlessly repetitive, as the examination occurred closer in time to the alleged sexual assault than the trial and was conducted not for investigative purposes, but for diagnostic and treatment purposes. Dr. Finkel, who testified as an expert in pediatrics with a specialization in the treatment of children believed to have suffered from sexual abuse, made conclusions based on his examination of Jill, and therefore, her statements to him were important to understand his opinions. Moreover, as the court found, the testimony was trustworthy, as there was nothing in the record to suggest Jill had a motive to fabricate her statement, and her comments to Dr. Finkel were consistent with her prior statements.

As stated, the examination was conducted for diagnostic and treatment purposes, not for investigative purposes. Thus, as defendant concedes, even if Dr. Finkel's testimony was not permissible pursuant to the tender years exception to the hearsay rule, it was admissible under Rule 803(c)(4), statements made for the purpose of medical diagnosis or treatment. The court did not err in permitting the State to present Dr. Finkel's testimony.

Allegations of Sexual Abuse by Others

1. 1996 Claims Regarding "Paul and Papi"

Also prior to trial, defendant moved to admit Jill's prior allegedly false allegation of sexual abuse by another individual under N.J.R.E. 608(b)(1). Defendant asserted this evidence could have been used to impeach Jill's credibility.

Consequently, the court held a Rule 104 hearing during which Jill testified. Defendant noted that when Dr. Finkel asked Jill during her 1996 medical examination if anyone else did things similar to what defendant did to her, she mentioned a "Paul" and a "Papi," but no further details were provided. During the hearing, Jill testified that she did not remember giving Dr. Finkel that information. She did not deny that she might have said something to that effect, but she did not remember saying it. Jill testified that she did not know anyone named "Paul" or "Papi."

In explaining why she might have said something like that, Jill stated, "[w]ell, my mom tried to get me to lie. That's what she wanted me to do. . . . To be a family again." When Esther first heard Jill had mentioned a "Paul" or "Papi," Esther said that "Paul" could have possibly been Paul V., a man she had dated on and off in the past. However, Jill did not remember anyone named Paul.

A-0940-22

In a written decision, the court found Jill's testimony was "credible and truthful." It noted that when Jill initially came forward in 1996, she only "identified one perpetrator, [defendant], . . . and referenced various acts of sexual abuse he committed."

As for "Paul," the court found Jill only mentioned that name after Esther's conversations with investigators and after she was asked by Dr. Finkel if anyone else did things similar to what she said defendant did to her. However, Jill did not "provide any description of Paul's conduct" during that time. The court stated that during both her 2019 interview with investigators and the Rule 104 hearing testimony, Jill "confirmed that she did not know any 'Paul' and that no one by that name ever abused her." For those reasons, the court determined, "by a preponderance of the evidence, that . . . defendant ha[d] failed to prove that a prior accusation charging criminal conduct was ever made by J[ill] against Paul, and consequently that no prior false accusation was ever made."

Nevertheless, the court determined that, "[e]ven if the one mention of Paul to Dr. Finkel can be construed as a prior false allegation," it would evaluate the factors set out in State v. Guenther, 181 N.J. 129, 157 (2004), which are used in determining the admissibility of a prior false accusation. After analyzing those factors, the court found that the fourth factor was "inconclusive," and that

A-0940-22

defendant failed to satisfy the fifth factor. The court denied defendant's request to introduce Jill's statement to Dr. Finkel regarding Paul during trial.

Similarly, as for "Papi," the court found "the defendant ha[d] failed to prove that a prior accusation charging criminal conduct was ever made by J[ill] against Papi, and consequently that no prior false accusation was ever made." The court denied defendant's motion to admit Jill's statement regarding "Papi."

Absent an abuse of discretion, we will defer to a trial court's evidentiary ruling. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). "We will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). "Every mistaken evidentiary ruling, however, will not lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so." Ibid. (citing State v. Prall, 231 N.J. 567, 581 (2018); R. 2:10-2).

Rule 608(b)(1) provides:

> In a criminal case, a witness' character for truthfulness may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation.

A-0940-22

In deciding whether to admit evidence of a prior false accusation, the trial court must conduct a Rule 104(a) hearing and then determine by a preponderance of the evidence whether the defendant has proven that the victim-witness made a prior accusation charging criminal conduct and whether that accusation was false.  Guenther, 181 N.J. at 157.  The trial court may consider the following factors in making its determination:

> 1. whether the credibility of the victim-witness is the central issue in the case;
>
> 2. the similarity of the prior false criminal accusation to the crime charged;
>
> 3. the proximity of the prior false accusation to the allegation that is the basis of the crime charged;
>
> 4. the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial; and
>
> 5. whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time.
> [Ibid.]

In considering the fifth factor, the trial court concluded:

> [T]he risk of undue prejudice, confusion of the issues, and the waste of time greatly outweigh the relatively weak probative value of the false accusation.  First, as noted above, this accusation was of such insignificance that it only came in the form of J[ill] uttering a single word, "Paul," and only after her mother mentioned him

to investigators. No party engaged in any formal investigation after she uttered that one word. To admit that in the face of the detailed accusations J[ill] made against defendant would risk undue prejudice. The risk of confusion of the issues is of even greater concern. Allowing this accusation in would require a mini trial of an individual who J[ill] does not remember and who [Esther] had not seen for four years at the time of J[ill]'s accusation in 1996. A key witness to the alleged accusation—[Esther]—is deceased and would thus be unable to provide insight into why J[ill] might have mentioned Paul prior to the medical examination. Moreover, [Esther] cannot be cross-examined as to J[ill]'s assertions that it was [Esther] who wanted her to accuse someone other than [d]efendant. And finally, admitting this accusation will do little to assist the jury in determining if this defendant committed the acts that he is charged with committing against J[ill]. J[ill]'s accusation against Paul was not an alternative to her accusation against defendant, but rather a single word uttered when Dr. Finkel asked if anybody else did what she said defendant did to her. Defendant has never asserted how Paul is even involved.

We are satisfied the court properly exercised its discretion in prohibiting the admission of Jill's statements regarding Paul or Papi. As the trial court found, the evidence presented at the Rule 104 hearing revealed that Jill never mentioned "Paul" or "Papi" until her examination with Dr. Finkel, which took place one month following her initial disclosures. Jill did not mention those names to her teacher or to any of the investigators. Further, when Jill mentioned

48

"Paul" and "Papi" to Dr. Finkel, she did not provide any additional details regarding her interactions with them. She simply said the names.

The court found that Jill stated, credibly, that she had no recollection of either a "Paul" or "Papi" and she did not remember giving those names to Dr. Finkel. The record suggests Jill uttered those names after being influenced by Esther, and since Esther was deceased by the time of trial, she could not be questioned regarding that information. It was not an abuse of discretion for the court to determine that Jill's prior statement to Finkel about "Paul" and "Papi" was inadmissible.

Nonetheless, the court also precluded the admission of this evidence following consideration of the Guenther factors. Assuming factors one, two, and three applied, the record supports the court's conclusion that factors four and five weighed against admissibility. As for factor four, the trial court found the number of witnesses to present the evidence could arguably be few. However, the amount of time required for presentation of the issue had the potential to be significant, because, in response to the introduction of that evidence, the State would have to put forth its entire investigation from 1996.

As for factor five, Jill mentioned the names "Paul" and "Papi" to Dr. Finkel once. Jill provided Dr. Finkel with no additional information regarding

49

who those individuals were and what those individuals allegedly did to her, which is in stark contrast to her description of the assaults committed by defendant. Also, as articulately stated by the trial court, there was the risk of undue prejudice, confusion of the issues, and waste of time—considerations which greatly outweighed any potential probative value.

The court did not err in its determination that Jill's prior statement to Dr. Finkel about "Paul" and "Papi" was inadmissible.

### 2. Claims Regarding an Unknown "Hispanic Man"

Defendant also sought to introduce evidence regarding a separate allegation of sexual assault made by Jill during her 2019 interview with detectives. Defendant contends this evidence could have been used as evidence of third-party guilt or to demonstrate that Jill had prior sexual knowledge, which informed her allegations against defendant.

During her 2019 interview with detectives, Jill revealed that she remembered an incident where she was touched inappropriately by another individual that occurred about the same time she was assaulted by defendant. She thought the incident happened when she was "at least" in kindergarten, somewhere "around that time."

A-0940-22

On that occasion, Jill remembered going on a crabbing trip with defendant, and falling asleep at some point. When she awoke, a man was carrying her into a house and sat her down. He then took out his penis, and as he did so, she started crying. The man rubbed Jill's face and then took his hands, opened her mouth, and pushed her head on his penis, telling her to be quiet.

Jill said the man was "definitely Spanish" and had a mustache and dark black hair. He also wore gold-colored glasses. She did not recall seeing him before or after the assault, and she did not know his name.

The court denied defendant's motion to introduce the evidence, stating:

> This court finds that while J[ill]'s allegation against the unknown Hispanic man is probably true, there is no nexus to the abuse she attributes to defendant. Defense counsel has not demonstrated that the alleged abuse by the unknown Hispanic man was any more than a hostile event whose connection to the case is mere conjecture. Nothing in the parties' submissions or J[ill]'s testimony indicated that her allegations against the unknown Hispanic man served as an alternative allegation to her claims against defendant. J[ill] expressly stated that defendant sexually abused her, and that at another, remote time and place an unknown Hispanic man abused her. The nature of the abuse differed—as she reported that the unknown Hispanic man forced her to perform oral sex one time, while she alleged defendant engaged in numerous other inappropriate sexual acts on various occasions. The location of the abuse differed— as J[ill] stated that the unknown Hispanic man abused her in an unknown location on a chair, and she alleged defendant consistently abused her on the bed in his

51

> bedroom or the bathroom in their home. And the timing of the abuse differed: J[ill] provided a clear timeline of the abuse she alleged defendant committed—when she was between the ages of six and eight—while her recollection of the unknown Hispanic man's abuse was vague and without any reference to when it occurred. Therefore, J[ill]'s allegation[] against . . . the unknown Hispanic male [is] inadmissible for the purpose of arguing third party guilt.
>
> Besides the entirely vague nature of the one encounter with the unknown Hispanic man, the conduct would not be admissible because of the Rape Shield Statute.

New Jersey courts have long recognized that "by implication, a complete defense includes a criminal defendant's right to introduce evidence of third-party guilt 'if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" State v. Cotto, 182 N.J. 316, 332 (2005) (quoting State v. Fortin, 178 N.J. 540, 591 (2004)). "That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt." Id. at 333. However, "a defendant cannot simply seek to introduce evidence of some hostile or indecent event and 'leave its connection with the case to mere conjecture.'" State v. Perry, 225 N.J. 222, 239 (2016) (quoting State v. Sturdivant, 31 N.J. 165, 179 (1959)). "Rather, the evidence . . . must be capable of demonstrating 'some link between the [third-party]

evidence and the victim or the crime.'" Ibid. (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 301 (1988)). "The decision to admit or exclude evidence of third-party guilt is 'particularly fact-sensitive' and rests within the trial court's discretion." Ibid. (quoting State v. Loftin, 146 N.J. 295, 345 (1996)).

Jill's testimony during the Rule 104 hearing demonstrated she was not confused about her past allegations of sexual assault. She was certain that the man who assaulted her during the crabbing trip was not defendant. In fact, Jill specifically emphasized that while defendant took her on the trip, he was not present when the assault occurred.

Further, as found by the trial court, there was nothing presented during the hearing that suggested that Jill's allegations against the unknown man served as an alternative allegation to her claims against defendant. Jill unequivocally stated that defendant abused her as a child. She provided details as to when, where, and how that abuse occurred. The details she gave differed drastically from the incident that took place with the unknown man. The court's determination that the incident that occurred with the unknown man was separate from the incidents that occurred with defendant was amply supported by the presented evidence. The court did not err in prohibiting admission of the evidence as supporting third-party guilt.

A-0940-22

New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, was enacted to "place[] restrictions on a defendant's ability to introduce evidence of the rape victim's past sexual conduct." Perry, 225 N.J. at 234 (alteration in original) (quoting Assemb. Judiciary L & Pub. Safety Comm. Statement to A. 677 (Jan. 20, 1994)). "[T]he Rape Shield Law 'is designed "to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character."'" Ibid. (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)).

Notwithstanding, "the Rape Shield Law also aims to 'ensur[e] a fair determination of the issues bearing on the guilt or innocence of the defendant.'" Id. at 235 (alteration in original) (quoting State v. P.S., 202 N.J. 232, 261 (2010)).

False allegations of prior sexual abuse by a child victim in a child abuse case are beyond the reach of the Rape Shield statute and may be used to impeach the credibility of the child witness subject to traditional evidentiary considerations. State v. B.M., 397 N.J. Super. 367, 377 (App. Div. 2008) (child's prior "false allegations are not protected by the Rape Shield Statute"). Conversely, when a court determines a child's prior allegation of abuse are true,

the Rape Shield protections apply, and the court must conduct the appropriate evaluation for admissibility.  Id. at 378.

"Thus, under our case law interpreting the Rape Shield Law, determining the admissibility of evidence of a [child] victim's prior [truthful] sexual [abuse allegation] requires a two-step analysis."  Perry, 225 at 236 (citing State v. Garron, 177 N.J. 147, 172-73 (2003); State v. Budis, 125 N.J. 519, 532-34 (1991)).

> The first step requires the trial court to ascertain whether evidence encompassed under the Rape Shield Law is relevant and necessary to resolve a material issue in light of the other evidence that is available to address that issue. . . .
>
> If found to be relevant, the court must then, as the second step, decide whether, under N.J.R.E. 403, the probative value of the contested evidence outweighs the prejudicial effect to the victim in the context of the Rape Shield Law. . . .  Under the Rape Shield Law, the probative value of a victim's prior sexual conduct "'depends on clear proof that [the conduct] occurred, that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense.'"
>
> The prejudice contemplated by the Rape Shield Law includes the trauma to the victim, the degree to which the evidence sought to be admitted would invade the victim's privacy, the "impact of a given ruling on a victim reporting sexual abuse," as well as the need to guard victims from excessive cross-examination and prevent undue jury confusion.  Given that a "trial court must weigh the relevance of the proffered evidence, its

necessity to the defense, and its apparent veracity against its potential to humiliate the victim, invade [the victim's] privacy, and confuse the jury[,]" . . . "[t]here is . . . substantial overlap between the relevancy determination [called for] in the first step of the [analysis], and the measure of the 'probative value' for purposes of the second step."

[Id. at 236-38 (all but fourth alteration in original) (citations omitted).]

Thus, "whether evidence of a victim's prior sexual conduct is admissible 'is exquisitely fact-sensitive' and 'depends on the facts of each case.'" Id. at 238 (quoting State v. J.D., 211 N.J. 344, 358 (2012)).

Here, as discussed, the allegations against defendant were not similar to the allegation against the unknown man. The locations were different, the times were different, and the acts, as well as the words used to describe the acts, were different. Moreover, the effects were different; for example, Jill discussed experiencing pain after defendant's assaults, but did not discuss experiencing anything following the assault by the unknown man.

However, the incident did occur around the time Jill made the allegations against defendant and Dr. Finkel said Jill could not have known about sexual details given her young age when she made the claims. Therefore, the evidence was likely relevant. Nevertheless, the determination to not admit the evidence

56

was harmless error in light of the ample other evidence presented to support the jury's verdict.  See R. 2:10-2.

Fresh Complaint Evidence

Defendant asserts the trial court erred in admitting the testimony of six fresh complaint witnesses.  We disagree.

Pretrial, the State moved to admit certain fresh complaint testimony that was made by Jill, Hillary, and Martha.  Subsequently, the court conducted a Rule 104(a) hearing in which six fresh complaint witnesses testified.  The first was Connors, Jill's teacher, in 1996.  As to Connors's proposed testimony, the court found:

> Here, the circumstances under which the disclosure occurred, the relationship between the alleged victim and witness, and the type of questions asked, strongly weigh in favor of admission of [Connors's] testimony. [Connors] was J[ill]'s first-grade teacher, a relationship that tends to include a level of trust.  It is not unexpected that very young students would disclose issues that are troubling them to a teacher . . . .  Further, given her age it is not surprising that J[ill] would feel comfortable telling her classmate the disturbing information and then telling her teacher . . . about it. . . . Finally, [Connors's] questions were general and not leading.  She first asked the open-ended question of whether J[ill] wanted to tell her anything.  [Connors] did not mention anything relating to sexual abuse until J[ill] disclosed what defendant allegedly did to her. Therefore, this court finds [Connors's] testimony is admissible as fresh complaint evidence as to J[ill].

A-0940-22

The second was Joe, Hillary's high school boyfriend. The court found:

> The circumstances of this disclosure, H[illary]'s relationship to [Joe], who initiated the discussion, and the types of questions asked weigh in favor of admission here. [Joe] was H[illary]'s boyfriend, and thus a natural confidant. Further, H[illary]—and not [Joe]—initiated the conversation to explain her aversion to sexual contact. [Joe] testified he never asked H[illary] any questions but was rather just the recipient of the information. Thus, [Joe]'s testimony meets the criteria for fresh complaint evidence.

The third witness was Martha. As to her proposed testimony, the court found:

> [T]he closeness of H[illary]'s and M[artha]'s relationship, the circumstances of the interrogation, and the types of questions asked weigh in favor of admitting M[artha]'s testimony. H[illary] and M[artha] were very close family members and friends, and thus natural confidants. Further, although . . . it is unclear who initiated this conversation, it is clear that the conversation arose naturally and not as the result of prodding or coercion by either girl. . . . Therefore, M[artha]'s statement is admissible fresh complaint testimony for alleged victim H[illary].

The fourth witness was Martha's childhood friend. The court found:

> The relationship between [the friend] and M[artha], the circumstances of the disclosure, and the types of questions asked favor admitting [the friend's] testimony as fresh complaint evidence. [The friend] testified she and M[artha] were best friends and spent time together nearly every day. Further, M[artha]'s disclosure arose only after she arrived . . . crying. [The friend] did not

A-0940-22

ask anything about sexual abuse, but merely asked why M[artha] was crying and what she and her father fought about. Only then did M[artha] disclose that defendant sexually abused her.

The fifth fresh complaint proffered was Mary. The court found:

[Mary's] relationship with M[artha], the circumstances of the questioning, and the types of questions asked here support admitting [Mary's] testimony. [Mary] is M[artha]'s step-sister, and at the time M[artha] often spent time at [Mary's]. Further [Mary] only asked M[artha] if something was wrong when she noticed M[artha] was not a[cting] [like] herself. [Mary] did not ask leading questions. Rather, M[artha] told her defendant raped her without any specific prompting by [Mary]. Therefore, M[artha]'s disclosure to [Mary] is admissible as fresh complaint evidence as to M[artha].

The sixth witness was Hillary. The court admitted the testimony "for the same reasons" it admitted Martha's.

The fresh complaint doctrine is a common law exception to the rule against hearsay. State v. C.W.H., 465 N.J. Super. 574, 599-600 (App. Div. 2021). It "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." Id. at 599 (quoting State v. Hill, 121 N.J. 150, 151 (1990)). "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." State v. R.K., 220 N.J. 444, 455 (2015). In determining whether a complaint was made

within a reasonable time after the act(s) occurred, the lapse of time between the incident(s) and the reporting does not bar the statement if explained by the youth of the victim and the statement's attendant circumstances, such as "being cajoled and coerced into remaining silent by their abusers." State v. Bethune, 121 N.J. 137, 143 (1990); see also State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003) (finding that a greater "lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint").

Stated differently, the reasonable time component of the fresh complaint rule must be applied flexibly "in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them." State v. W.B., 205 N.J. 588, 618 (2011) (quoting State v. P.H., 178 N.J. 378, 393 (2004)). Whether a victim voiced a complaint within a reasonable period after a sexual assault must be decided on a case-by-case basis with the court "[s]triking the appropriate balance between a defendant's right to confrontation and society's interest in adjudicatory reliability." P.H., 178 N.J. at 390.

"[F]resh-complaint evidence serves a narrow purpose. It allows the State to negate the inference that the victim was not sexually assaulted because of her [or his] silence." Hill, 121 N.J. at 163. "[T]he purpose of the rule is to prove

only that the alleged victim complained, not to corroborate the specifics of the victim's allegations." P.H., 178 N.J. at 393 (quoting Bethune, 121 N.J. at 146). Thus, fresh complaint evidence is limited to "[o]nly the facts that are minimally necessary to identify the subject matter of the complaint." R.K., 220 N.J. at 456. Accordingly, fresh complaint evidence may not "corroborate the victim's allegations concerning the crime," ibid. (quoting Bethune, 121 N.J. at 146), and the court must "assess . . . whether repeated testimony of the victim's complaint is irrelevant or prejudicial to the defendant." Hill, 121 N.J. at 169.

"The determination whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to the discretion of the trial court." State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002) (citing Hill, 121 N.J. at 167-68). An abuse of discretion may be found if the court made a "clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

We discern no error in permitting the fresh complaint witnesses' testimony. Connors spoke with Jill on February 5, 1996, when Jill was seven years old. In her conversation with Connors and in her later conversations with investigators, Jill revealed that inappropriate interactions between her and

defendant had been going on for several months, beginning when she was six years old. So delayed reporting was a key issue in the case.

In addition, the conversation between Connors and Jill happened spontaneously and voluntarily. Although Connors did approach Jill regarding information she heard from another student, she did not put any pressure on Jill to answer. Connors testified that she asked Jill very general, open-ended questions, and gave Jill the opportunity to respond freely. Moreover, because Jill did not indicate that the assaults had stopped, reporting was done within a reasonable time. As Jill's teacher, Connors was certainly someone that she would turn to for support. In addition, Connors's testimony was not extensive. She merely summarized her conversation with Jill and why that conversation led her to speak with the school counselor and the principal.

Defendant argues that "H[illary]'s alleged hearsay statements to [Joe] and M[artha] did not occur within a reasonable amount of time." He asserts that because the State did not meet its "burden to prove why a lengthy delay was reasonable," the court erred in admitting the "years-delayed report to [Joe] and M[artha] as fresh-complaint evidence."

However, the State did present a plausible explanation as to the delay. Hillary was a child when the sexual abuse happened, and therefore, the "special

A-0940-22

vulnerability" of children warrants additional flexibility. W.B., 205 N.J. at 618 (quoting Bethune, 121 N.J. at 143). Hillary testified that the delay was attributable to her fear of not being believed and splitting up her family. Hillary saw what happened to Jill and was scared that something similar would happen to her. Although Hillary did not live with defendant, she testified there was an extremely close relationship between her and her extended family. Hillary said she was at the house frequently, as her mother, Mary, relied on defendant and Esther to babysit. The court did not abuse its discretion in admitting Joe's and Martha's testimony under the fresh complaint doctrine.

Defendant further contends as to Martha's allegations that, while the "statements to M[ary] and [the friend] appear to fall within the parameters of the fresh complaint doctrine," Hillary's testimony regarding Martha's allegations "was inconsistent" and "cumulative" and thus, "should have been excluded." We disagree.

Both Hillary and Martha testified that, while they were sitting in Hillary's room listening to music one day, they revealed to each other that defendant had abused them. Their testimony regarding this conversation was short, providing little to no detail. In addition, the evidence strongly supported the finding that the statements were not the product of any coercion and were completely

voluntary.  As stated, Hillary and Martha had a very close relationship due to being close in age and the frequency with which they would visit each other's houses.  Therefore, it was not an abuse of discretion for the court to permit Hillary's testimony regarding Martha's disclosure.

Defendant's theory at trial was that the alleged victims conspired against him with false tales of sexual assault primarily because of his decision to divorce Esther.  To rebut that argument, the State needed to present evidence that the victims' claims did not suddenly arise following defendant's decision to seek a divorce.  For that reason, the State introduced the testimony of fresh complaint witnesses, who could corroborate the victims' allegations.  Furthermore, any prejudice was ameliorated by the court's issuance of a limiting instruction, which was given three times throughout the course of trial, prior to the fresh complaint testimony.  See Model Jury Charges (Criminal), "Fresh Complaint:  Silence or Failure to Complain" (rev. Apr. 15, 2013).

Victims' Testimonies

In point VII, defendant argues that "[t]he trial court improperly allowed the alleged victims to testify about how the abuse affected them."  Defendant asserts the testimony was "not relevant to proving any of the charges."

A-0940-22

During trial, the prosecutor asked each victim "how [the abuse] has impacted" their lives. When defense counsel objected during Hillary's testimony, the court overruled the objection, finding the testimony was relevant as to the State's burden to prove an injury, which could be psychological. Hillary responded: "Since coming forward and bringing this to life I've suffered tremendous anxiety, depression, PTSD, things that I've suppressed over so many years have kept me up all night, every night reliving them. It's just been really, really rough."

Defense counsel did not object to the question during Jill's testimony. She answered: "I'm in therapy for PTSD and anxiety. Also[,] I didn't trust any men growing up. And I just didn't really have anybody I guess."

Martha responded:

> This made my life so hard. All those times he used to make himself come off as such a nice man and I was you know just a bad child, said I didn't listen to my parents. You know he was supposed to protect me. He was supposed to teach me how to you know get older, protect my own kids -- actually take care of --like the steps you're supposed to do as a father. He skipped that and instead he wanted to like just forget about us. He moved away after -- which was great. It was fine that he moved away. But, then he decided to communicate and still call me and say he wanted to see my kid. And[] that's a red flag. No thanks. I'm good. He . . . caused me to have . . . post[-]traumatic stress disorder[.]

A-0940-22

. . . .

> Because I sat here for the longest time just saying if I keep it in, . . . if I [do] not say anything, if I hold it in, I'll forget about it. It'll go away. Well, it doesn't go away. You don't forget about these things. As you get older you vividly remember -- you get trauma from this. And it made my life a lot . . . harder.

N.J.R.E. 401 defines "[r]elevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Evidence is probative under N.J.R.E. 401 "when it has a tendency 'to establish the proposition that it is offered to prove.'" State v. Burr, 195 N.J. 119, 127 (2008) (quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)).

Relevant evidence may be excluded by the trial court if "its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice . . . waste of time, or needless presentation of cumulative evidence." R. 403.

In finding "undue prejudice" under Rule 403, a court must determine

> whether the admission of certain evidence would be unduly prejudicial [so that] . . . the evidence's probative value "is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence."

[State v. Trinidad, 241 N.J. 425, 449 (2020) (second alteration in original) (quoting Thompson, 59 N.J. at 421).]

Here, the victims' credibility was at issue. Defense counsel argued they made up the allegations against defendant in 2019 because they were seeking revenge against him for leaving and divorcing Esther. The testimony regarding the impact that the abuse had on their lives was relevant to the victims' state of mind and as to why they did not report the abuse earlier. We also note the testimony from each witness was brief. The prosecutor did not discuss it during closing arguments.

We disagree with the court's reasoning for overruling the objection. However, the testimony was relevant and not precluded under Rule 403. It is well settled that it is the propriety of the result reached below that controls the result on appeal, and not the rationale given for those results. See, e.g., State v. Anderson, 248 N.J. 53 (2021) (affirming judgment upholding forfeiture of pension for reasons different than the Appellate Division); State v. Williams, 444 N.J. Super. 603, 617 (App. Div. 2016) ("It is well-established that a reviewing court can affirm a decision on different grounds than those authorities offered by the court being reviewed."). The court did not abuse its discretion in permitting the brief testimony.

<u>Scope of Cross-Examination</u>

In point V, defendant argues that "[t]he trial court curtailed the ability of defense counsel to test the State's witnesses and present a defense through . . . legitimate lines of cross examination." We discern no merit to this contention.

During defense counsel's cross-examination of Jill, counsel asked her about a conversation she allegedly had with her biological father around the time she came forward and reported being assaulted by defendant. The prosecutor objected. Defense counsel argued that the conversation was referenced in one of the police reports, which recounted when Jill was living with her biological father, she told him that the allegations she made against defendant were untrue. The prosecutor again objected, arguing that Jill's biological father was not being produced as a witness, and that the alleged conversation was hearsay. The court sustained the prosecutor's objection, ruling that because the prosecutor could not "confront" Jill's biological father, the evidence was inadmissible.

As previously noted, deference is given to a trial judge's evidentiary rulings "absent a showing of an abuse of discretion," or where "clear error of judgment" has occurred. <u>State v. Marrero</u>, 148 N.J. 469, 484 (1997).

The right to cross-examine witnesses is constitutionally guaranteed to the accused. <u>State v. Harvey</u>, 151 N.J. 117, 187-88 (1997). But the scope of cross-

examination remains under the control and purview of trial judges, and a reviewing court should not interfere absent a showing of clear error and prejudice. State v. Murray, 240 N.J. Super. 378, 394 (App. Div. 1990).

Hearsay is "a statement that[,] the declarant does not make while testifying at the . . . trial or hearing," offered in evidence "to prove the truth of the matter asserted." N.J.R.E. 801(c). "Hearsay is not admissible except as provided by these rules or by other law." N.J.R.E. 802. When there are multiple layers of hearsay, every layer must satisfy a hearsay exception in order for the statement to be admissible. N.J.R.E. 805.

Here, defense counsel attempted to cross-examine Jill with a statement her biological father allegedly made to an investigator. That statement was hearsay within hearsay. Since Jill's biological father did not testify, and because there was no other exception that applied to that statement, it was not an abuse of discretion for the court to prohibit defense counsel from pursuing that line of questioning. Further, defendant was not prejudiced by the exclusion of this evidence. The jury was well aware that Jill recanted her previous allegations against defendant before the grand jury. Thus, Jill's statements to her father, which allegedly occurred around the same time, would have added little to no probative value.

69

We similarly find insufficient merit in the remainder of defendant's arguments regarding the cross-examination of witnesses to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Dr. Finkel's Expert Testimony

In point VI, defendant argues the trial court "improperly allowed Dr. Finkel to bolster J[ill]'s credibility and to provide the net opinion that, despite the absence of physical evidence, he knew that there had been penetration."

As stated, Dr. Finkel testified as an expert, explaining his process of interviewing the parent and child, using an anatomic model and the results of his examination. Dr. Finkel noted Jill said defendant only touched her with his penis on the outside of the anus, describing a back-and-forth motion on her buttocks. She also said defendant touched her vagina with his penis.

Dr. Finkel told the jury:

> So when we do an examination, we separate those labia majora and minora and we look into a space. And that space is called the vaginal vestibule. As we know in common parlance [t]hat vestibule means hallway or entrance way. And so . . . it's still not the vagina.
>
> As you separate that space, you look to the back of that space and there's a piece of tissue, and that's the dividing line between the internal and external genital structures of the female. And that's called the hymen.

So anything between the labia in front of the hymen is considered to be penetration in the structures of the vaginal vestibule. Actually technically part of the external genital structures. Anything . . . noted to be in the vagina, that object has to go through that space called the vaginal vestibule and through the opening in the hymenal membrane to get into the vagina.

And she thought it was in like that, okay.

. . . .

As in vaginal penetration. That was her perception. Because many times your kids don't know genital anatomy. And there's many times a discrepancy between the perception of what had happened, and what actually happened. Surely, any . . . genital contact, regardless of the degree of penetration would be inappropriate.

As stated, Dr. Finkel reported the physical examination was "totally normal," which told him that "any penetration that [Jill] experienced was limited to penetration between the labia . . . it was inside in that sense. Because she complained that it hurt her to pee afterwards." He indicated that while there may have been some trauma to the tissues surrounding Jill's urethra, those injuries were superficial and had healed.

In providing his diagnostic assessment, Dr. Finkel stated: "I have no alternative explanation for her to be able to describe the experiences that she had in the manner that she had to explain it, other than having experienced such."

71

An expert is not permitted to tender an opinion that is "not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). N.J.R.E. 703 requires an expert opinion be grounded in

> facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject.
>
> [Ibid. (quoting Biunno, N.J. Rules of Evidence, cmt. 1 on R. 703 (2005)).]

The "net opinion" rule, a corollary of Rule 703, "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). While a conclusion "based merely on unfounded speculation and unquantified possibilities" must be excluded, failure "to account for some particular condition or fact which the adversary considers relevant" or "give weight to a factor thought important by an adverse party" may be "a proper 'subject of exploration and cross-examination at a trial'" but is not a basis for exclusion. Townsend v. Pierre, 221 N.J. 36, 54-55 (2015) (first quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997); then quoting Creanga v.

72

Jardal, 185 N.J. 345, 360 (2005); and then quoting Rosenberg, 352 N.J. Super. at 402).

We are satisfied Dr. Finkel's opinion was permissible because it was based on his medical experience as well as his evaluation of Jill. He adequately explained the 'why' and 'wherefore' of his opinion and did not simply provide a mere conclusion. Dr. Finkel described his interview with Jill, and explained how the information she provided led him to certain conclusions. The court gave the jury the appropriate instructions regarding expert testimony, and it was for the jury to determine how much weight to accord the expert's testimony. We see no error in the admission of Dr. Finkel's testimony, and any arguable error was rendered harmless by the court's instruction clearly defining the jury's role as ultimate factfinder.

False In One, False In All Charge

We need only briefly address defendant's contention that the court erred in denying his request for a false in one, false in all charge.

The "false in one, false in all" model jury charge instructs jurors that if they believe any witness

> willfully or knowingly testified falsely to any material
> facts in the case, with the intent to deceive you, you
> may give such weight to his or her testimony as you

may deem it is entitled. You may believe some of it, or you may, in your discretion, disregard all of it.

[Model Jury Charges (Criminal), "False in One—False in All" (rev. Jan. 14, 2013).]

"It has been long recognized that the issuance of a false in one, false in all charge rests in the sound discretion of the trial judge." State v. Young, 448 N.J. Super. 206, 228 (App. Div. 2017).

Although Jill recanted her earlier allegations against defendant in front of the grand jury when she was a child, she explained why she did so, and therefore, as properly found by the trial court, it was for the jury to either "believe her or not." Because there was no evidence that Jill "willfully or knowingly testified falsely to any material facts in the case, with the intent to deceive," there was no basis for the court to provide the false in one, false in all charge.

In addition, the court did instruct the jury that "as judges of the facts, you will weigh the testimony of each witness and then determine the weight to give it. Through that process, you may accept all of it, a portion of it, or none of it." See Model Jury Charges (Criminal), "Parts 1 & 2 (General Information to Credibility of Witnesses)" (rev. Sept. 1, 2022). Therefore, the jurors were instructed that, as factfinders, they could disbelieve and reject Jill's testimony. The court did not err in omitting the "false in one, false in all" instruction.

<u>Sentence</u>

Defendant contends that the court committed "several" sentencing errors "resulting in a manifestly excessive sentence."  We see no reason to disturb the sentence.

In considering the length of defendant's sentence, the court found aggravating factors one, N.J.S.A 2C:44-1(a)(1), three, N.J.S.A 2C:44-1(a)(3), and nine, N.J.S.A 2C:44-1(a)(9), and mitigating factors seven, N.J.S.A 2C:44-1(b)(7), and fourteen, N.J.S.A 2C:44-1(b)(14), applicable.  As for aggravating factor one, the nature and circumstances of the offense, the court found:

> [The court] ha[s] to be careful to separate the crime itself, and, certainly, the crime of aggravated sexual assault and sexual assault is heinous, cruel, and depraved in and of itself.
>
> The question is whether there are other factors that the [c]ourt should consider in deciding whether or not aggravating statutory factor one is in the case. . . . And this [c]ourt agrees with the [State] that, above and beyond the sexual assault, which is bad enough, there was other behaviors that made it especially heinous, cruel, or depraved.
>
> Certainly, as set forth, even in the psychologist's report of the defendant, I think it was page . . . two, he would not only sexual[ly] abuse [Jill], but hit her with a belt without any pants on or underwear.  He would punish her psychologically by sending her outside in a diaper at the age of five years old.  Four or five, which was demeaning.

He also . . . used [Jill's] . . . difficulties in school against her, as well as his role as a stepfather. Instead of advocating for her, he took advantage of what a normal father would have tried to help her with.

He used his daughter, [Martha's] love for her mother against her. And, . . . weaponized her love for her mother.

And, as far as H[illary] is concerned, he took advantage of her mother's situation as a young single mother, . . . to abuse her, as well.

But understanding that . . . the crime itself is heinous and cruel, . . . while I find aggravating factor one, I give it moderate weight.

The court gave aggravating factor three, the risk that defendant would commit another offense, moderate weight. The court noted that "this wasn't a one time occurrence, even with each girl, it was multiple times, over and over and over with each girl, each child." The court further noted that this factor was also supported by the psychologist's report, which referenced evidence of repetition.

The court also found applicable aggravating factor nine, need for deterrence, noting there was a need to deter defendant and others from "probably society's most heinous crime, taking advantage of children." The court gave that factor "extremely heavy weight."

A-0940-22

In addition, the court found mitigating factor seven, defendant's lack of a criminal record, but gave that factor "light weight" because defendant had been abusing the victims since 1994 but was never charged or indicted. Finally, the court also found mitigating factor fourteen, that the age of defendant was under twenty-six at the time he committed the assaults, but again, gave that factor light weight, as the court noted that while defendant started abusing the victims when he was twenty-one, he continued abusing them for thirteen years. In sum, the court found the aggravating factors substantially outweighed the mitigating factors.

The court also discussed and analyzed the factors enumerated in State v. Yarbough, 100 N.J. 627 (1985), and concluded that consecutive sentences were warranted. In imposing sentence, the court stated:

> I believe that this aggregate sentence comports with overall fairness. You used money and special treatment to keep your sexual slaves in line. . . . [Y]ou abused not just one child, but three children, stepdaughter, a step-granddaughter, and your biological child.
>
> This abuse took place over 13 years. And what I find truly most galling is that even after [Jill] disclosed to a school mate, and an investigation was launched, you didn't let that stop you. It probably emboldened you. You probably figured you were untouchable. I got away with it on her, I'm going to do it to . . . my step-granddaughter, and my own child. And they knew

what would happen if they opened up their mouths. Because their . . . sister was put in foster care.

. . . .

This abuse took place . . . in three separate locations over 13 years, and . . . you went from 21 to 34 years old. You did it for . . . almost more than half of your life at that time. So, I believe[] that overall fairness requires this aggregate sentence of 45 years with 25 years of parole ineligibility.

We review sentencing determinations with a deferential standard, State v. O'Donnell, 117 N.J. 210, 215 (1989), and will disturb a trial court's sentence only in instances where the sentencing guidelines were not followed, the aggravating and mitigating factors found by the trial judge were unsupported by the evidence, or the judge's application of the sentencing guidelines rendered the sentence clearly unreasonable. State v. Roth, 95 N.J. 334, 365 (1984). Under that deferential standard, only when the facts and law show "such a clear error of judgment that it shocks the judicial conscience" should a sentence be modified on appeal. Id. at 363-64.

We will not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 237 N.J. 15, 28-29 (2019) (quoting State v. Miller, 205 N.J. 109, 127 (2011)).

Defendant asserts that the court "erred [in finding] aggravating factor [one] based on [defendant's] conduct towards J[ill] that was unrelated to the offenses charged." Defendant contends "that factor should not have been found as to the offenses concerning H[illary] and M[artha] where no such conduct was alleged."

Under aggravating factor one, the court "reviews the severity of the defendant's crime, 'the single most important factor in the sentencing process,' assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public." State v. Fuentes, 217 N.J. 57, 74 (2014) (quoting State v. Lawless, 214 N.J. 594, 609 (2013)). This analysis "must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Id. at 63. In State v. Kromphold, 162 N.J. 345, 353 (2000), our Supreme Court observed:

> In [Yarbough, 100 N.J. at 633], we recognized that facts that established elements of a crime for which a defendant is being sentenced should not be considered as aggravating circumstances in determining that sentence. We reasoned that the Legislature had already considered the elements of an offense in the gradation of a crime. Ibid. If we held otherwise, every offense arguably would implicate aggravating factors merely by its commission, thereby eroding the basis for the gradation of offenses and the distinction between elements and aggravating circumstances. In the same manner, double-counting of elements of the offenses as

aggravating factors would be likely to interfere with the Code's dedication to uniformity in sentencing.

In appropriate cases, however, "a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75 (citing O'Donnell, 117 N.J. at 217). "A sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Ibid. (alteration in original) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010), abrogated in part on other grounds, State v. Palma, 219 N.J. 584, 595-96 (2014)).

Here, the court took particular note of defendant's manipulation of the victims, and how that manipulation aided him to continue the sexual assaults. The court found support for aggravating factor one not only in the trial record, but also in the report of the psychologist who evaluated defendant. Additionally, the court was careful to avoid double counting, giving aggravating factor one only "moderate weight" in light of the circumstances. For those reasons, the court did not err in finding that aggravating factor one applied.

Defendant also argues that the court "erred in discounting the weight applied to the mitigating factors." However, the weight to be afforded to a particular aggravating or mitigating factor is within the discretion of the

sentencing court. <u>Miller</u>, 237 N.J. at 28-29. In this instance, the court determined to give the mitigating factors little weight and expressed its reasons for the decision. Because its findings were based on adequate evidence in the record, we see no error in the determination.

Defendant further argues that the "court failed to merge Counts 2, 4, 6, and 8 with Counts 1, 3, 5, and 7." However, aggravated sexual assault and sexual assault require separate elements for conviction, so the counts do not merge for purposes of sentencing. <u>See</u> <u>State v. Miles</u>, 229 N.J. 83, 96 (2017) ("We resolve the question of which test applies in our courts by adopting the same-elements test as the sole double-jeopardy analysis, thereby realigning New Jersey law with federal law. We no longer recognize the same-evidence test as a measure of whether two offenses constitute the same offense."). Regardless, the court appropriately sentenced defendant to concurrent terms on those offenses.

Defendant requests this court to remand for reconsideration as to the imposition of consecutive sentences. We decline to do so. As the court noted, these crimes involved different victims, at different times, at different places, and therefore, were separate acts of violence. There was no error in the

imposition of consecutive sentences, particularly as the court expressly addressed the overall fairness of the aggregate term.

In sum, the court followed the sentencing guidelines, and its findings regarding aggravating and mitigating factors were supported by the record. The sentence does not "shock the judicial conscience," especially considering that defendant was found guilty of eight offenses.

To the extent we have not commented on them specifically, all other points defendant raises on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0940-22